UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| TONYA SKOIEN, | CIVIL NO. 5:15-CV-166-KKC |
| Plaintiff, | |
| V. | MEMORANDUM OPINION AND ORDER |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

\*\*\* \*\*\* \*\*\*

Plaintiff Tonya Skoien filed this medical negligence action under the Federal Tort Claims Act, ("FTCA") 28 U.S.C. § 1346(b), 2671 *et seq.* alleging that she received inadequate medical care at the Veterans Affairs Medical Center ("VAMC") in Lexington, Kentucky.

This matter is now before the Court on the United States' motion for summary judgment. Because Skoien fails to sufficiently prove the elements of a Kentucky medical negligence claim, her FTCA claim must fail. Therefore, the United States is entitled to summary judgment.

I. BACKGROUND

On June 9, 2013, while helping her fiancé and his family herd cattle, Skoien stepped into a tractor rut, fell, and injured her left wrist. [DE 19, Page ID # 101, ¶ 4-17]. Skoien thought she broke her wrist, so she went to the emergency room at the VAMC, where she was employed. [DE 19, Page ID # 102, ¶ 3–23]. Emergency room doctors determined that her wrist was broken. Specifically, she was diagnosed with a left distal radius fracture, or Colles' fracture, [DE 23, Page ID # 668, 692, 907]. She was referred to an orthopedic physician for consultation and treatment. [DE 24, Page ID # 875]. Several orthopedic surgeons reviewed the X-rays and confirmed that Skoien had sustained a left distal radius fracture, and placed

1

her in a "sugar tong splint." [DE 24, Page ID # 876]. The splint "opened up on the side for swelling" but, in her deposition, Skoien testified that "it was really tight." [DE 19, Page ID #106, ¶ 5–6, ¶ 16–17]. After the splint was applied and placed in a sling for comfort, an appointment was then scheduled for the next week. [DE 24, Page ID # 877; DE 23, Page ID # 682]. Skoien was instructed to return to the emergency room if needed. [DE 24, Page ID # 922].

On June 14, 2013, Skoien returned to the VAMC for her follow-up complaining of pain and tingling in her left forearm. [DE 24, Page ID 895]. Her left wrist also showed signs of swelling and her fingers were discolored. [DE 24, Page ID # 896]. VAMC physicians took additional X-rays and determined that her "cap refill [was] good,"—i.e., Skoien had adequate blood circulation to her hand and fingers. [DE 23, Page ID # 901]. When Skoien complained of tightness in her splint, her treating physicians scheduled an additional orthopedic consultation, at which doctors were to evaluate whether or not Skoien's current "sugar tong splint" needed re-splinting. [DE 24, Page ID # 902].

Four days later, at her orthopedic consultation, X-rays revealed a "slight interval loss of reduction" from the setting of the fracture. [DE 24, Page ID # 891]. Treating physician Dr. Robert Thompson noted that the X-ray findings "[met the] criteria for nonoperative treatment." [DE 24, Page ID # 891]. He further explained to Skoien that, if she experienced any more significant reduction, she could benefit from a surgery to realign the bone fracture. [DE 24, Page ID # 891]. To address her complaints about the tightness of the splint, Skoien's splint was loosened around the thumb. The progress note from that day indicated that the adjustment resulted in a "significant improvement in [her] pain." [DE 24, Page ID # 891].

This improvement did not last long. [DE 19, Page ID # 115, at ¶ 5]. Skoien testified in her deposition that she would "complain to pretty much everyone about the pain and tightness

2

of the [splint]."[1] [DE 24, Page ID # 717]. On two separate occasions, Skoien sought out Mr. Standifer, who worked in the orthopedic clinic, to have him make adjustments to the splint. [DE 24, Page ID # 717]. Mr. Standifer agreed to loosen the splint "to a degree" but made sure the splint "still [kept] its integrity." [DE 24-5, Page ID # 940, p. 16, ¶ 9–10]. Though Mr. Standifer made two slight adjustments to the splint, he refused to remove the splint because he did not the authority to do so. [DE 24-5, Page ID # 940].

On June 25, 2013, VAMC physicians again "re-loosened" the splint around the thumb and adjusted the splint to allow for more flexion. [DE 23-2, Page ID # 647]. At her next appointment, doctors removed the splint and replaced it with a cast. [DE 24-2, Page ID # 883; DE 19, Page ID # 125, ¶ 12–21].

The cast proved too painful for Skoien. A week later, she returned to the VAMC complaining of pain and tightness from the cast, which was removed and replaced with a wristlet splint. [DE 23-2, Page ID # 639]. But even the new splint did not alleviate her pain. Skoien testified that the next day, thinking that she was "going to lose [her] hand," she removed the splint herself and decided to discontinue treatment at the VAMC. [DE 19, Page ID # 131–132].

On July 11, 2013, Skoien met with Dr. Donald Arms of Central Kentucky Orthopedics to explore alternative treatment options. At the consultation, Dr. Arms noted that Skoien had "positive Phalen's, Tinel's, median nerve compression testing at the wrist, and she ha[d] vasomotor and pseudomotor changes that would be characteristic of early complex regional pain syndrome . . . ." [DE 23-3, Page ID # 695]. According to Dr. Arms, the CRPS was a "second diagnosis that [was] based on problems with the sympathetic nervous system that controls pain and sensation and blood supply to the extremity." [DE 20, Page ID # 225, ¶ 20–25]. Skoien

---

[1] Skoien's pleadings state that she complained about her "cast." However, her deposition, along with the relevant medical records, states that during this time she was still in a splint. [DE 19, Page ID # 114-115].

3

and Dr. Arms then discussed the benefits and risks of operative and nonoperative options for treatment, which were both "viable options at that point." [DE 20, Page ID # 255, ¶ 14]. "[A]fter a long discussion," Skoien elected to have surgery on her wrist. [DE 23-3, Page ID # 696].

On July 15, 2013, Dr. Arms successfully performed an open carpel tunnel release and open reduction internal fixation procedure on Skoien. [DE 23-3, Page ID # 697]. Dr. Arms' surgery notes indicated that "she had developed an early complex regional pain syndrome, probably due to subacute progressive median nerve compression at the wrist." [DE 23-3, Page ID # 697]. However, Dr. Arms did not know whether Skoien exhibited any median nerve compression and the signs and symptoms of early CRPS *before* she broke her wrist and had surgery. [DE 20, Page ID # 228, ¶ 19-23]. After surgery, Dr. Arms diagnosed Skoien with carpel tunnel syndrome and early malunion of the left distal radius fracture. [*Id.*]. Skoien was discharged that day and scheduled for a follow-up appointment for later in the week. [DE 23-3, Page ID # 699].

In the weeks following the surgery, Skoien's arm pain continued to plague her, and she showed little improvement. Skoien met with Dr. Arms again on September 3, 2013, where he noted that "she's not responding well." [DE 23-3, Page ID # 694]. According to Dr. Arms' progress notes, Skoien still exhibited "significant stiffness, motion loss and hypersensitivity" related to her diagnosis of "complex regional pain syndrome after fracture." [*Id.*]. As part of his treatment plan, Dr. Arms referred Skoien to Dr. Karim Rasheed, a pain specialist who worked at Elite Pain Center and St. Joseph Hospital.

Dr. Rasheed first saw Skoien on September 9, 2013, for a consultation. In his evaluation, Dr. Rasheed noted "clearly the patient has left complex regional pain syndrome[1] with left upper extremity, related to her Colles fracture. . . ." [DE 23-5, Page ID # 702]. Skoien then returned to Central Kentucky Orthopedics for her four- week follow-up, where she met with Dr. Travis Hunt. Although X-rays revealed Skoien's wrist fracture to be healed, Dr. Hunt

4

referred Skoien to Dr. Ronald Burgess, a hand surgeon, for additional treatment because she still suffered from recurring stiffness and tightness in the wrist. [DE 23-3, Page ID # 693].

Dr. Ronald Burgess of Commonwealth Orthopedic Surgeons, PSC, met with Skoien on October 21, 2013. Dr. Burgess noted that Skoien had "significant stiffness of her left wrist and hand which appear[ed] to have been related to the initial immobilization in full extension and a painful splint." [DE 23-6, Page ID # 703]. Skoien and Dr. Burgess discussed Skoien's treatment options, including a procedure involving "manipulation of the wrist and all digits under anesthesia with instill of cortisone into the individual joints after manipulation." [DE 23-6, Page ID # 704]. Skoien elected to have the procedure, and Dr. Burgess successfully performed the outpatient procedure on November 5, 2013. [DE 23-6, Page ID # 705]. Skoien's last visit with Dr. Burgess was on November 20, 2013, where the two discussed surgical additional procedures that might increase Skoien's range of motion in her wrist. Reluctant to pursue any additional surgical interventions, Skoien refused. Skoien left Dr. Burgess with plans to continue working with Dr. Rasheed. [DE 23-6, Page ID # 707].

To date, Skoien continues various treatments and therapies with Dr. Rasheed. While still experiencing chronic upper left extremity pain secondary to CRPS, Skoien has improved, but, according to Dr. Rasheed, "she's still not a hundred percent." [DE 22, p. 29, ¶ 14–15].

On June 4, 2015, Skoien filed a complaint against the United States under the FTCA alleging "negligence and professional malpractice and misconduct in connection with the medical care provided to Plaintiff Skoien by the Department of Veterans Affairs at the Lexington, Kentucky Veterans Affairs Medical Center." [DE 1]. After the close of discovery on April 29, 2016, the United States filed a motion for summary judgment [DE 23]. This matter is now ripe for review.

5

## II. DISCUSSION

A. <u>Summary Judgment Standard</u>

To be prevail on a motion for summary judgment, the United States must meet the standard under Fed. R. Civ. P. 56(a). A motion under Rule 56 challenges the viability of another party's claim by asserting that *at least one essential element* of that claim is not supported by legally sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986). The Court reviews all of the evidence presented by the parties in a light most favorable to the non-moving party, with the benefit of any reasonable factual inferences that can be drawn in her favor. *Harbin–Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). As the moving party, the United States does not need its own evidence to support its assertion, but need only point to the absence of evidence Skoien presents to support her claim. *Turner v. City of Taylor,* 412 F.3d 629, 638 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 325). If the United States demonstrates that there is no genuine dispute as to any material fact and that it is entitled to a judgment as a matter of law, then summary judgment is proper. *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992).

In order to survive a motion for summary judgment, Skoien must point to evidence of record—such as affidavits, depositions, and written discovery—which demonstrates that a factual question remains for trial. *Hunley v. DuPont Auto*, 341 F.3d 491, 496 (6th Cir. 2003). Importantly, the Court is not required to speculate on which portion of the record Skoien relies, nor is it obligated to "wade through" the record for specific facts that support her claim. *See United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993) (citing *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied* 494 U.S. 1091 (1990)).

B.  <u>Skoien's FTCA Claim</u>

Skoien fails to state a prima facie case of medical malpractice under Kentucky law because she failed to produce any expert evidence to support her claim that her treatment fell below the established standard of care.

The liability of the United States under the FTCA is determined in the same manner and to the same extent as a private individual under similar circumstances. 28 U.S.C. § 1346(b). Because the alleged negligent treatment of Skoien occurred at the VAMC in Lexington, Kentucky, the law of Kentucky is to be applied in this case. *Id.*

Under Kentucky law, "a medical malpractice action is merely a 'branch of [the] well traveled road [of common law negligence]," *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682, 693-94 (Ky. 2003), which requires duty, breach, causation, and damages. *Id.* at 686. In order to state a prima facie case of medical malpractice,

> **a plaintiff must introduce evidence, in the form of expert testimony**, demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a proximate cause of the plaintiff's injuries.

*Pardassee v. United States*, No. 14-cv-145-JMH, 2015 WL 4491631, at *2 (E.D. Ky. July 23, 2015) (citing *Heavrin v. Jones*, No. 02–CA–000016–MR, 2003 WL 21673958, at *1 (Ky. Ct. App. July 18, 2003)) (emphasis added); *Reams v. Stutler*, 742 S.W.2d 586 (Ky. 1982); *Jarboe v. Harting,* 397 S.W.2d 775 (Ky. 1965)). "To survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff **must produce expert evidence or summary judgment is proper**." *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006) (citing *Turner v. Reynolds*, 559 S.W.2d 740, 741–42 (Ky. Ct. App. 1977)) (emphasis added); *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2012) ("[A] plaintiff bringing a typical medical malpractice case is required by law to put forth expert testimony

7

to inform the jury of the applicable medical standard of care, any breach of that standard and the resulting injury.").

Skoien deposed three doctors, all of whom treated Skoien after she was seen at the VAMC. However, none of the physicians testified as to standard of care or whether it was breached. In their depositions, neither Dr. Arms nor Dr. Rasheed even mentioned whether the care Skoien received fell below a standard of care. [DE 20, DE 22]. In considering both physicians' testimony as a whole, nothing could be construed as an opinion as to either the applicable standard of care much less a breach.

The closest evidence put forth by Skoien comes from Dr. Burgess, the orthopedic hand surgeon who performed the second procedure on Skoien's wrist. [DE 23-6, Page ID # 705]. Dr. Burgess testified at length about CRPS and whether Skoien's treatment at the VAMC could have caused or contributed to her condition:

> Question:  Can you explain why you felt [the immobilization of the arms and tight case was a significant contributing factor to Skoien's complex regional pain syndrome] within a reasonable medical probability?
>
> Answer:  Based on the information made to me, there were three events that occurred in her immediate early fracture care.  One apparently --according to Dr. Arms' notes, was an acute compression of the median nerve with acute carpel tunnel syndrome. Neurologic compression and pain associated with that has been associated with an increase incidence of complex regional pain syndrome.
>
> The second event that occurred, again, this based on the patient's report, was that her splint as applied was painful and continued to be painful and when subsequently changed, there was a sore on the skin where this -- the cast -- the splint had rubbed sore.
>
> And pain that continues on -- with that pain would have, I think, pain that increased as time went on rather than decreased as normal fracture pain would.  And change in -- or increasing pain can also be a contributing factor to the onset of what we now know as chronic regional pain syndrome.

8

> The final event, again by patient testimony and not by records, is that the initial splint extended to the tips of the fingers rather than to the mid-palm, as is more normal, for an immobilization of a distal radius fracture.
>
> And prolonged immobilization has also been implicated as a factor that can increase the incidence of chronic regional pain syndrome.
>
> . . . And therefore, within medical probability, I feel that they were significant contributing factors.

[DE 21, Page ID # 313-315]. Dr. Burgess did not testify that the care Skoien received was below the requisite standard of care:

> Question: And are you testifying or will you be testifying that there was a specific breach of the standard of care?
>
> Answer: I do not have medical documentation that would enable me to state that within medical probability.

[DE 21, Page ID # 309, ¶ 15-20]. And when asked again, he provided the same answer:

> Question: But you are not prepared to form an opinion that there's been a breach in the standard of care in this case, as you just testified, I think?
>
> Answer: That is correct.

[DE 21, Page ID # 315, ¶ 24-25, Page ID 316, ¶ 1-3]. The sum of Dr. Burgess' testimony, while thorough in many respects, does not establish the applicable standard of care or whether VAMC physicians' deviated from the proper standard of care in treating Skoien's Colles' fracture. In fact, Skoien admits in her pleadings that "[Dr. Burgess] cannot specifically offer an opinion as to whether there was breach in the standard of care." [DE 24, Page ID # 727].

Although not required under Rule 56, the United States provided a declaration and report by Dr. Joseph Dobner, an orthopedist at Rebound Orthopaedics and Sports Medicine

9

in Frankfort Kentucky, to support its contention that there was not a breach in the requisite standard of care. *Celotex Corp.*, 477 U.S. at 325 ("The moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only show that there is an absence of evidence to support the nonmoving party's case."). Based on his review of Skoien's case, Dr. Dobner stated "[t]hat there is no evidence in the record that the VA deviated from the standard of care." [DE 23-7, Page ID # 710].

The record in this case is clear. Skoien has not provided the expert testimony necessary to support a medical negligence claim under Kentucky law. Skoien's medical witnesses either failed to discuss or affirmatively declined to opine as to the applicable standard of care or whether it was breached.

To avoid dismissal of her medical negligence claim, Skoien argues that she does not need a medical expert to prove her claim because the VAMC staff's errors in treating, splinting, and casting her wrist were so obvious that an ordinary person could infer negligence from the facts. [DE 24, Page ID # 731]. In so doing, Skoien seeks refuge in the exception to Kentucky law's expert testimony requirement, which obviates the need of expert testimony in cases where negligence can be inferred when it is "so apparent that laymen with a general knowledge would have no difficulty in recognizing" it. *Jarboe*, 397 S.W.2d at 778; *see also Muhammad v. United States*, No. 08-CV-131-KKC, 2009 WL 3161481, at *5–*6 (E.D. Ky. Sept. 28, 2009) (reviewing the layman exception's roots in the doctrine of *res ipsa loquitur*). This argument fails because Skoien's own witnesses, medical doctors, could not or would not draw such an inference.

Moreover, this "layman exception" is very narrow. "Expert testimony is not required (1) where a layperson is 'competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care' or (2) when the defendant doctor makes an admission of a technical character from which it could be inferred

10

that the doctor acted negligently." *Jones v. Gaes*, No. 2009-SC-000780-DG, 2011 WL 1642225, at *2 (Ky. Apr. 21, 2011) (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992)). In cases where it applies, the doctrine excuses the need to establish a deviation below the standard of care with expert testimony. *Keel v. St. Elizabeth Medical Center*, 842 S.W.2d 860, 862 (Ky. 1992). Skoien's case does not fall within these limited exceptions.

In support of her claim, Skoien cites *Perkins v. Hausladen*, in which the Kentucky Supreme Court inferred negligence absent any expert testimony. 828 S.W.2d at 656. There a defendant surgeon admitted in deposition testimony that his performance in a sigmoid sinus operation fell below the standard of care. *Id.* But Skoien does not offer any argument of how *Perkins* applies to the present case, she merely recites the legal standard applied in *Perkins*. There is no evidence that VAMC staff have ever admitted liability that Skoien's was below the standard of care. Thus, the second "layman exception" is inapplicable.

Aside from her citation to *Perkins* and a reference to the Second Restatement of Torts, Skoien offers nothing to argue that the first "layman exception" should apply here. In failing to offer any sort of developed argumentation, Skoien has essentially waived the issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

Cases in which courts have allowed common knowledge to infer negligence are, for example, "where the surgeon leaves a foreign object in the body" or amputates the wrong limb. *Andrew*, 203 S.W.3d at 170. Such are cases where it does not take a medical degree and years of experience to know something negligent occurred. This is not one of those cases. The medical issues presented in this case demand medical expertise far beyond the purview of a layman.

11

The proper method for setting a broken wrist, the decision to intervene surgically or opt for conservative treatment, the length of time to splint or cast a wrist, and how to diagnose the cause of and treat symptoms related to pain are all medical questions for which there are no easy answers. If anything, this case is a prime example of when the first "layman exception" should not apply. Negligence is never presumed "from the mere evidence of mental pain and suffering of the patient, or from failure to cure, or poor or bad results, or because of the appearance of infection." *Andrew*, 203 S.W.3d at 170. Skoien's attempt to shoehorn such a broad theory into the narrow "layman exception" is unpersuasive. Accordingly, the "layman exception" to Kentucky's expert requirement does not apply here.

Skoien's case is one of understandable frustration. But the FTCA conditions the United States' liability for actions or omissions in this case on Kentucky law. Therefore, because Kentucky law requires that the claims asserted by Skoien be supported by expert testimony to adequately establish a deviation from the standard of care, and because Skoien has neither provided such expert testimony nor offered a legally sufficient justification for her failure to do so, Skoien has failed to make a sufficient showing as to elements that are essential to her case.[2] *See Celotex Corp.*, 477 U.S. at 322. Accordingly, there is "no genuine issue [of] material fact" as to these elements, and the United States is "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Andrew*, 203 S.W.3d. at 170 ("To survive a motion for summary judgment in a medical malpractice case in which a medical expert is required, the plaintiff must produce expert evidence or summary judgment is proper.").

---

[2] The Court need not reach the United States' alternative argument that Skoien failed to prove her treatment at the VAMC caused her to develop CPRS. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 324–25.

### III. CONCLUSION

Accordingly, **IT IS ORDERED** that the Motion for Summary Judgment filed by Defendant United States of America [DE 23] is **GRANTED,** and Plaintiff's Complaint [DE 1] is **DISMISSED WITH PREJUDICE.** A separate judgment shall issue.

Dated February 9, 2017.

*Karen K. Caldwell*
KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY